Our next case for argument is Epic Games v. Google Good morning, and may it please the court, Jessica Ellsworth for Google. I'd like to reserve four minutes for rebuttal. So like the last argument, I expect that there will be a number of questions from the bench, and we may not fit within our typical 20-minute timeline. So don't stress about that. We'll make sure that everybody gets to address the points that the court has. Thank you, Your Honor. Everyone agrees that Google and Apple vigorously compete to sell mobile devices and their operating systems. This competition has shaped how we walk through the world, how we bank, how we shop, how we view health information, how we play games like Fortnite. Epic lost in its effort to avoid this reality when the Apple District Court found that Apple's App Store, Google's Play Store, and other Android stores were all in the same area of effective competition. They all compete for mobile gaming transactions. Those are the large majority of transactions in the Play Store, just as they are in the App Store. Let me ask you, because much of your briefing tries to import what happened in the Epic Apple case to this case, I understand the cases were filed on the same day. Was there any effort by either party to basically consolidate in front of a single judge under the local rules of the Northern District? Your Honor, there was not. I think there are two reasons for that. One is that Epic chose to seek a TRO and then a preliminary injunction solely against Apple. That case ended up on a different timeline. The Google case got consolidated by the JPML with some other cases that were addressing the same conduct by Google. But that doesn't really answer why that wasn't... You didn't know that on the day that the case was filed, in terms of filing a notice to the court, right? We didn't. Your Honor, the face of the complaints very clearly tries to silo these two operating systems into two different markets for two different complaints. What the Apple court found, though, was that that siloing, after full litigation on the merits, that siloing was not valid and that, in fact, you can see this on page 1030, Apple's, quote, main competitor is Google, and then, for good measure, on 1036, that Google's, quote, main competitor is Apple. We're reading now from Judge Gonzales' decision. Yes, Your Honor, although this court used that same language about the main competitor in its own decision. But Judge Gonzales-Rogers looked at the market, the siloed version of the market, and said that that is not economic reality, that the economic substitutes for mobile gaming transactions are the App Store, the Play Store, the Samsung Galaxy Store, Amazon Store, and other Android app stores. And so in round two, after that finding had already been affirmed by this court, Epic sought a do-over. That is exactly what issue preclusion as a doctrine is meant to protect against. You can't just lose an issue that's fully litigated the first time around and then pretend that didn't happen and try to get a different result against a different adversary. The fact of this competition was necessary to the outcome in Apple I. Apple I relied on it for its rule of reason analysis. It relied on it for its monopolization analysis. It was necessary for this court's decision, too, which also relied on affirming the district court's market definition, its application of that market through the rule of reason analysis, and then on the monopolization claim as well. Just because there are players in the same market or potentially sub-markets doesn't necessarily mean that the Apple case is preclusive here. And let me ask you to really explore that because there ultimately, contrary to what I think Epic would have hoped, the market was digital mobile gaming transactions. Is that right? That's right, Your Honor. And here the market defined was the Android market and then the jury actually specified the other specific markets, which the jury said they were the app distribution and the in-app billing. And so now you're saying that we should basically throw that out and import the Apple. Is that right? So, Your Honor, I want to be very clear here. Our argument was that Epic was not allowed in its second suit to seek findings that were inconsistent with the Apple I findings about competition between Apple and Google, especially for the mobile gaming transactions. And that's more than 80 percent of the transactions that Epic was seeking in its do-over case against Google to get a different outcome from. Let me ask this. Epic raised a claim of an aftermarket theory with regard to Apple, which it did not raise with respect to Google, and I think it has good reasons why not. It doesn't overlay completely. Is your argument that Epic was not allowed to present different theories and different evidence with regard to Google and its own relationships with app distributors and original equipment manufacturers? Your Honor, the two complaints in this case start from a virtually identical position where the descriptions of the markets, one uses iOS and one uses Android, but they are the same. The words for market and aftermarket don't appear in either complaint. And Judge Gonzales-Rogers quickly brushed that aside and said, we're not talking about form over substance here. In substance, these are aftermarket claims. But asking my question itself, was Google allowed to present different theories and different evidence with regard to Google than what it had presented against Apple in this trial? Or is it your view that the trial should never have taken place at all? Well, Your Honor, I think there are sort of two layers to your question. On issue preclusion, we think, and this is why before trial we raised this in a motion in Lemonet, that their trial presentation, as far as it extended to mobile gaming transactions, could not seek an inconsistent result the second time around from what the court had already held the first time around and had been affirmed on appeal. At that point in time, it was unclear whether they would argue that they could still win, even with preclusion. But the district court chose not to address this pre-trial. That's why we ended up with it in a JMOL or new trial  But you never moved for summary. It just seems odd to me that if you think, I'll call it the Apple suit, if you think that precludes really the remedies and the claims here, why that wouldn't be on summary. Why that wasn't a summary judgment legal argument. It's a really important question, Your Honor, and I'm glad you asked. Because at the time that Google filed for summary judgment, it was facing multiple suits by multiple plaintiffs. And it filed a single summary judgment motion. All of the arguments in that motion were ones that if Google had won, they would have changed the scope of the trial. Issue preclusion of one issue against one plaintiff would not have affected the scope of the trial. It also was not yet clear whether this court was going to affirm or not on the market definition that Apple I had found. So what we did was raise it pre-trial through a motion in limine, asking for a limitation on their trial presentation. The district court didn't address it that way and that was fine. We then re-raised it after trial. There was no question about timeliness from the district court when we raised it after trial. The court's basis for its ruling was that it was not the same issue. Would that, under the SEC versus Stein, would that be reviewed on an abuse of discretion standard? No, Your Honor. The availability of issue preclusion is something that is reviewed de novo. It is when you get into the discretionary application of the doctrine that that is what's reviewed for abuse of discretion. So this is a de novo issue. It's de novo because you think it's dispositive? It is de novo because it is a question of whether the legal prerequisites for application of preclusion are met. But even if that's the case, why wouldn't it be an abuse of discretion standard to review whether the court has decided whether to... Let's say Judge Gennaro agreed with you that the legal standards had been met for issue preclusion. He still could have decided not to preclude and we would be reviewing that for an abuse of discretion, wouldn't we? So, Your Honor, he could. Of course, that was not how the facts played out and I think that would be a difficult finding to make in this case. The Parkwayne-Hosiery, the Supreme Court's analysis of issue preclusion is mandatory, not discretionary, or at least it is far less discretionary, and the factors that it sets out for what could guide a court's discretion, none of them would map onto the situation in this case. The other issue that I think is important and subject to de novo review is the aftermarket question that Your Honor started to raise, Judge Sanchez. An aftermarket, as this court has defined it, has one defining feature. The demand for a product is entirely derivative of some previously purchased product. That's it. That is all that is required to be in an aftermarket case. Here, the district court really did take a form over substance or sort of a magic words approach to whether this was an aftermarket case by refusing to instruct the jury on the basis that they had not heard the words foremarket and aftermarket. They surely understood that this entire case was built on what happened after you bought an Android phone. Epic's own opening statement, you can see this at 5 ER 964, starts from the fact that quote, on Android smartphones, the primary place that people go to get their apps is the Google Play Store. So we're talking about Android smartphones. In fact, there are 400 references during the trial to Android phones or Android devices. So this jury heard roughly on one out of every eight pages of trial transcript that we were talking about what happened after you purchased an Android phone. That makes this an aftermarket limit? So that's based up there is the, they define the market simply as the Android operating system. Is that right? Who is the they in your question? Epic. Epic describes... Nobody else here except you and Epic. At this point, everybody else is gone. Epic describes, I believe, two markets. One was an app distribution market on Android phones and the second was the in-app billing market, again, on Android phones. So everything about their markets is limited to what happens on an Android phone. Correct. That's why... So then on the Android phones themselves, is the four market the multiple Android phones that are available? Your Honor, I'm going to take us back to the Apple case for a minute because I think one of the important things in the Apple case, when it came up on appeal, Epic argued to this court that the Apple district court had been wrong to say that the four market had to be devices. And in fact, Epic argued the four market could be the operating system. And this court agreed that the four market could be the operating system. And so fast forward to this case, and we have a situation where whether it's the device or the operating system, and we know it can be either, that purchase has to happen before a consumer can be trying to consummate a transaction on that device. Can it be either? I thought Apple too, we said it was related to a durable good. And so can the aftermarket theory be based on an operating system that Google doesn't, that is open? And I mean, I see a little difference here. And I thought the aftermarket, the difficulty with your argument is that the aftermarket would be based on the smartphone phones themselves of which there are many manufacturers. So your Honor, the court did use the durable good language, but then it accepted Epic's position that the four market purchase could be a durable good with a particular operating system. And it didn't matter that the operating system wasn't itself available as a product. That was actually one point on which Epic prevailed in the Ninth Circuit was this whole question about whether the operating system could be considered the appropriate four market competition. Assuming that we read that case the same as you, is there any other case that uses the aftermarket concept unhinged from a durable good? Well, I don't think it's unhinged from a durable good here because... No, my question is not here. Is there any other case, assuming we want to follow your line of reasoning, where there is an aftermarket theory that's not predicated on durable goods? I just want to read it. I think there was some discussion of a Microsoft case from the 1990s in the D.C. Circuit that also involved... I can't remember exactly what the operating system was, but there was a discussion in that case that I believe the Apple decision from this court refers to in its discussion of why a phone with a particular operating system can be the appropriate four market competition. Did you ever... The other thing that somewhat is a surprise, so I'm looking at the jury instruction that you proffered. I think it was on November 22nd. Up to that point in the trial, had there ever been argued that the jury was looking at a four market and an aftermarket? Your Honor, it's correct that the words four market and aftermarket had not been used, and that is what the district court focused on. I don't think those are magic words, but the theory, where was that argued? Just point me to that. Your Honor, the concept, I think, is throughout this case, starting with the opening that I read you, but Epic's own expert said to the jury that the demand for apps flows entirely from the purchase of a device. That's Mr. Bernheim's testimony at 6 ER 1256. Market definition was not our burden, so the reality is when we have a case that is about a four market purchase, here, an Android phone, whatever the phone is, it has an Android operating system on it to get us into the bucket of transactions that Epic is trying to make this case about. That aftermarket framework brings with it an economic presumption that competition between Apple and Google up front for the phone purchase is going to sufficiently discipline what happens in the aftermarket. The economic presumption is in place. If Epic wanted to meet and try to rebut that economic presumption, it could. That's why it's claimed failed in Apple. I think it's obvious why it didn't want to then have to try to make that same showing that it had just failed to make in the Apple case when this case came around. Did you object to the jury verdict form which asked what is the relevant market? I don't believe that we objected to the asking for the relevant market. Are you saying now that the jury's answer basically should be ignored because, in your view, there was this instructional error? Your Honor, I think what we're saying, and I'm trying to be very precise in response to Your Honor's question, I think what we're saying is that the jury was not given the proper instructions about what the standard is to find an aftermarket. Having not been properly instructed, that is presumed prejudicial. In fact, I think we know it was prejudicial here because that's the same element of an antitrust claim that is the reason Epic's proposed market, this siloed approach, failed in the Apple case. They couldn't show what they needed to show. They couldn't rebut this economic presumption that flows from the factor talking about what happens after you've already bought something. After you've bought a Kodak photocopier, what happens? After you've bought an Android phone, what happens? The aftermarket issue is really one that the jury needed to know in order to properly exercise its duty here. I'm going to switch course a little bit. Thinking about both the preclusion and the aftermarket issues and the comparison to the Apple case, as I'm thinking about those issues, another thing that I'm thinking about is an overarching antitrust principle is you take every case on its facts. We have these general rules, and then we take every case on its facts. There are definitely some clear factual differences between the Android world and the Apple world. All of your arguments brush that idea aside, and I'm trying to figure out how that works with this overarching principle of we take every case on its facts. I completely agree with you, Your Honor. We take every case on its facts. Here, there are a number of facts that I want to highlight when you take every case on its facts. One is that 70 plus percent of the Apple App Store market is mobile gaming transactions, and 80 plus percent of Google's Play Store transactions are gaming transactions. These cases that were filed on the same day by the same lawyers about the very same transactions, and Epic has never disputed that these cases are about the same transactions, how a consumer who wants to buy Mine Coins is connected with Minecraft in order to consummate that transaction. These transactions are the same in both cases. I understand all of that. It seems like the District Court was thinking, I don't know if sub-market is the right word, but if I look at just the Android world, it works different than the Apple world, right? It's not the walled garden and all this stuff. Why is it wrong for the District Court to focus at that one step down level? Your Honor, all of that, I think, gets at why Epic could have made a different argument about the aftermarket prerequisites being overcome, the economic presumption being overcome, because it was talking about different consumers who had purchased a different device. What is the same in both cases is that we're talking about something that requires an earlier purchase. So those facts are really identical. You need to buy an iOS phone to be in the Apple case. You need to buy an Android phone here. What happens after you've bought that phone? I agree that some of the allegations are different about how Apple runs its operating system, how Google and the Android operating system operate. But that goes to Epic's burden to overcome this economic presumption, not whether the presumption applies in the first place. So on your theory that the smartphone using an Android operating system is the foremarket, what is the aftermarket? I think it's the same aftermarket that was at play in Apple. It's these transactions that are consummated to have a consumer purchase an app or make an in-app purchase. So that would include the Samsung Galaxy Store? See, that's what's unclear to me from your brief. And I've spent a lot of time on both briefs trying to unpack this argument because it wasn't really laid out at trial that I could understand. So if I take your assumption that we've got all the phones and we've got the Samsung, we've got Nokia, we've got a bunch of Chinese and other phones that operate on the Android system, what precisely then becomes the aftermarket? Because the cases that we're looking at, Optronics and Kodak, they're kind of like a single, you know, I've got one printer or two printers and then I've got my cartridges over here. This is real different. So what is the aftermarket? I think the aftermarket is how you complete transactions on the device with the Android operating system. So it can be through the Play Store, the Galaxy Store, other Android stores. But the limitations, you can't go to Apple's App Store. There are certain limitations that come from buying an Android phone. And the district court here. Can I just stop you there? I mean, to me that's a little amorphous. It's whatever transactions these phones might accomplish. When the focus here has been on the Play Store. So with the Samsung market being significant in the for market, as you call it, I'm still having trouble. You say, how do you complete transaction limitations? So I'm having trouble because this case was about the Play Store. It was, but it was also about Android. And I would point the court to the complaint. If I could suggest you look at paragraphs 68 and 78. Let me just ask you to be precise because so far I've read all that. That's complaint language. Now we're in like trial land. What's being argued? What's the case? What's the evidence? Is there evidence here about how Galaxy, for example, imposes what restrictions, what pricing, that sort of thing? I think there was some of that evidence at trial. But I don't think any of that has relevance to the question whether we are in an after market case. Because the after market nomenclature that's used turns on, and I'm quoting from this court's Apple decision, where demand for a good here, some sort of purchase on an Android device, is entirely dependent on the prior purchase of a durable good. Here, that Android device. Once we're in that world where we're talking about after markets, there are four things a plaintiff has to show to overcome the economic presumption. One is that the after market restrictions aren't just running low. Presumption meaning that actually that doesn't in and of itself prove an antitrust violation. I think it's actually the inverse of that. That in and of itself doesn't excuse or eliminate a possibility. It doesn't eliminate the possibility. Right. There are four things a plaintiff would have to show in order. I mean, this is a narrow, and it's purposefully narrow, because this kind of approach to antitrust law where you're really cutting off from your view, competition that everyone agrees is happening for the for market product in your analysis. The Supreme Court in its Kodak decision, this court in New Cal, this court in the Apple case has been clear. These are sort of a disfavored approach to antitrust. Right, and I think that's what you may be hearing some wrestling with this, because it is a narrow framework, but you're describing it in fuzzy and broad enough terms that it almost sounds to me as if what you're really trying to do is just define different relevant markets based on the facts before us, which is what we do, but set aside a for market aftermarket theory. And I think the counterargument to all this is even if Google does vigorously compete with Apple, that doesn't necessarily mean that Google can create its own different ecosystem in which it acts as a monopolist through the Google Play Store vis-a-vis other distributors and app store competitors. And so that seems to me where the trial ended up going with a different set of facts and a different definition of the relevant market. And why isn't that the more, the theory with more traction than trying to shoehorn in an aftermarket theory that is not a single brand, and the different manufacturers and different things, and I don't know. I'm a little lost with this. I just want to pause on the idea that this court could have two decisions in two cases just a couple years apart in which the very same product in one case is subject to the aftermarket framework, and the very same product, those very same transactions in another case are somehow not subject to the same governing legal framework. The short answer to that is that the Apple operating system and the Apple universe is different, as Judge Sanchez points out, to this Android universe. It has to be different in a relevant sense. I agree there are differences, but the relevant sense is whether it requires you to buy a good before you're talking about this. The district court was really hung up on this being some very complex framework that the jury had heard nothing about. What does get complex is how to rebut the presumption. I agree with you on that, and the district court in Apple found three reasons that Epic didn't rebut it. This court ruled on one of them. It didn't address the other two, but either way, it didn't meet its burden there. The actual application of the economic presumption, though, flows from facts that are the same between the two cases. Your Honor, can I comment? Can I test that? I just want to see if I understand this aftermarket thing by giving you a hypothetical. If I go to Home Depot and I need to buy a stove, and I have electric stoves and I have natural gas stoves, and I purchase the natural gas stove, obviously there's competition. There's more than one company that makes that option of stove. I purchase that, and then necessarily if my stove breaks, then I have to buy parts that work with a natural gas version. Is this theory that you're describing, would it work in that context in the same way? Your Honor, the difference might be, and I don't know very much about the stove market. I don't know how much stoves have an operating system in the way that all of Android phones do. Android is a brand in the relevant sense, and that's what just like iOS was a brand in the relevant sense. When you talk about an Android phone, people know that you're talking about a phone that's running on an Android operating system. It's licensed to the operating system. That's what I'm getting at is why isn't it just a component? When we talk about it's a brand, okay, I mean it has a brand name, a label, but why isn't it just a component? When at least in the Android world, you're not necessarily dealing with the same company in the foremarket or the aftermarket. You might not be dealing with the person who created or owns Android in either of those markets. Your Honor's question I think is, it parallels the way this court reasoned in the Kodak case that ultimately went up to the Supreme Court, and the Supreme Court created this aftermarket framework in. I think your questions are very good ones, but I do think in Kodak the Supreme Court is the one who adopted this view that there are a very limited way in which plaintiffs can exclude some of the competition to purchase a good by focusing just on what happens after you purchase it, but it comes with these very significant strings that are attached, and that's what the problem was here. The jury didn't hear about those strings, and those strings are what led to the failure of Epic's claims in the Apple case. So basically to me you're defining the foremarket and the aftermarket as parallel or the same almost. So then I would ask you, well, what about the sideloading, for example? Does that change? Is it really a single market brand in the aftermarket? I don't think that sideloading fits into the question about whether the aftermarket framework applies or not. Sideloading, again, might play a role in Epic trying to rebut, for example, what do customers know when they make their Android phone purchase? Are there information costs that they don't know about the lifecycle of this good? Are there switching costs that come because of sideloading? Those are all arguments that were open for Epic to make in trying to meet its burden, but it didn't try to meet that burden, and it convinced the district court not to hold it to that burden by not instructing the jury on this aftermarket instruction. I'm cognizant of time, so I might turn to the remedies because there are a number of them. Before you get there, I want to ask one question. You've suggested that the district court erred by submitting Epic's claims to a jury. If we were to agree with you about that, what's the remedy? What do we do about it? I think the remedy is that this needs to go back for a Rule 52 finding of fact and conclusion of law that spells out the analysis that leads to a liability ruling. The easiest way to understand why this is a problem is if you look at Judge Gonzales-Rogers' decision, she authored 185 pages carefully parsing the evidence, credibility, what were the anti-competitive effects arguments, what were the pro-competitive justifications, was there a least restrictive alternative? She walked through all of that in great detail. In our case, what we have is a jury verdict. They were asked eight questions where they had to check yes or no, and they offered 14 words defining a relevant market. So in order to actually have a liability determination that is reviewable on appeal, in a case that required a bench trial because there was no consent to a jury trial, it should go back for a bench trial analysis. That, of course, assumes that you're correct on your jury trial issue, correct? That does. I would note, though, Your Honor, there is no court, and Epic has not pointed to one either, that has ever forced a party into a jury trial on equitable claims over that party's objection. The only two courts that have addressed this, the 11th Circuit and the 7th Circuit, have both found that you can withdraw consent to a jury right up to the eve of trial. So there is no court, and this would really be making new law to say that a party can be, under Rule 39, forced into a jury trial when all of the circumstances have changed in their case. They have been making an objection for over a month before the trial was supposed to start about the possibility this may switch to a bench trial if the party with the jury trial right settles. You would, in effect, have a reversal, have no jury verdict, but keep the record and turn it into a bench trial, is that right? I think you could do that, and I'll just put two caveats on that. One is I think you need to address whether preclusion applies in that new trial, and two, I think you need to address— If I disagreed with you on preclusion, would we then just have the trial testimony? Then I think you still need to address whether the aftermarket is the legal governing framework so that the district court, when it approaches this, understands what the standard is by which it has to assess the evidence. And here I think the court could do that on the existing record because it wasn't until the charge conference that the court made the determination about whether or not to give the aftermarket's instruction. So this entire case, this trial record, was created on the understanding that the aftermarket's presumption might apply, and so I think you could use the existing record. Can I ask a question, though, on your jury instructions? Were jury instructions submitted at the beginning— proposed jury instructions submitted at the beginning of the case? The proposed jury instructions were submitted at a point in time in the case when there was a party with a jury right. Okay, but that's—I'm just trying to get a sense. Usually you send in a set of proposed instructions. They obviously change over time when you get right down to it. So that was some time, and in those proposed instructions, before you got to the November 22 situation, was there an aftermarket instruction proposed? Yes, Your Honor. They were included in the very first instructions that we provided to EPIC in September of 2023. They were filed with the court in October of 2023. It's docket 679. That aftermarket's instruction is also in the revised proposed final instructions at docket 806 at page 50. So it is something— Thank you. I'm just trying to understand that. Is it your view, going back to the jury trial issue, is it your view that if a party withdraws consent, that the district court must take that withdrawal at any point in time, you know, even on the eve of trial, that there's no discretion for the court to say, no, I've planned things a different way? So the way that the Eleventh Circuit and the Seventh Circuit approached this in the F. N. Herschel and Kramer case was to say that there is nothing in Rule 39 that imposes any time limitation on when you can withdraw and that even to the eve of trial would be appropriate. I think those courts left open a possibility that a party might argue that it was prejudiced by the late withdrawal, not by the fact that the trier of fact would be changed, but there would be some sort of prejudice that flowed from that change. But that's a different question than the one I'm, that's a different issue than the question that I pose, which is if a party decides to withdraw consent at the last minute, does the district court have to be stuck with that withdrawal of consent? Or can the district court, because there's a countervailing understanding that the district court has broad discretion in managing their own docket and trial proceedings. If you're right, well, I just want to understand your position first. I think that in a case that involves purely equitable claims, Rule 39 limits a jury trial to situations where there is consent. And so Rule 39 doesn't build in some sort of time period by which you have to withdraw consent. And here I think it's worth noting, one, we didn't ever consent. And two, even if somehow you could read consent as into this different circumstance of the whole MDL, we plainly withdrew it. And so – So the corollary is people will have a right to a jury trial for damages, but they can sometimes waive that if they don't, you know, by their conduct or the timing of things. Why – and I understand you disagree as to whether Google consented or not, but the district court did find that there was consent. Why – even if you did have some sort of a right to a bench trial, we want to call it that, why couldn't the district court have reasonably found that Google waived that right by waiting too late, you know, until the eve of trial in order to withdraw consent? I don't think any court has ever approached this through a waiver lens. I think the way the courts have talked about it is that they have looked to see if there was some sort of specific prejudice that would flow from the shift in time. And so, for example, if you try to withdraw your consent to a jury trial mid-trial or at the charge conference or after – essentially after the jury has already heard part of the claim and a portion of the case has been presented where someone doesn't know who the ultimate trier of fact is going to be, courts have said that's too late. Well, it's interesting because Rule 39 doesn't say anything about timing, doesn't say anything about prejudice, doesn't say anything about reasonableness. And it builds in an option for if you don't have consent, the court, you can always do an advisory jury. So why isn't that the fallback if you don't have consent? And here, the district court seemed to say, I don't have consent, I'm just not accepting that. I agree, Your Honor, that that was the district court's approach. And I think if it had wanted to use an advisory jury, it probably could have. But an advisory jury doesn't excuse the court from issuing a Rule 52A, findings of fact and conclusions of law, at the end. And that's, again, where the – I mean, I agree with that procedurally. So my question then comes back to Rule 39 governs this only if it's triggered. And 39C starts out with, in an action not triable by right – not triable of right by a jury, the court may, one, try an issue – so action and issue – may try an issue to an advisory jury or may try an issue to a jury on consent. So none of that is triggered unless we are in an action not triable of right by a jury. And my lingering question there is, Google had counterclaims. They triggered a right to a jury. At the start of this trial, when the court was making this decision about, does this go to the bench or does this go to the jury, weren't those counterclaims still alive and didn't they still trigger a right to a jury? Yes, Your Honor, there was a counterclaim that was still alive at that point in time. And I think that's why in the filings that Google made in that month leading up to trial, it consistently said, if we settle with the match plaintiffs, who were the other remaining plaintiffs at that point in time, we're going to have to consider what claims go to the jury and what don't. Because Google did have, as Your Honor points out, a counterclaim that was triable to the jury. EPIC had its antitrust claims that were not triable to the jury. It had its UCL claim that was not triable to the jury. And it had an illegality offense to Google's counterclaim that was also not triable to a jury. So nothing that EPIC wanted to present was an issue that it had a jury trial right on. And the court understood this. So I guess I'm not – in trying to figure out if 39C is triggered and trying to figure out, is this an action not triable of right by a jury, what does action mean? Is this a claim not triable to a jury or is this a whole case that has nothing that triggers a right to a jury? So, Your Honor, it can't be the whole case perspective because there are often cases that have equitable pieces and jury-triable pieces, and some of them get – some of those then get resolved by the jury and some get resolved afterwards by the court. What Rule 39C is looking at is that the claims and issues that get presented to a jury, when there is no right to a jury on those claims and issues, that can only happen when you have consent, which we didn't have here. And I think the district court understood this, to make just one last point on this, and I'm quoting the court. This is from October 12th, so this is weeks before the November 6th trial date. The court understands Google's argument and says, if it's equitable, you don't want a jury. That's the issue. It's going to be a jury trial unless and until a settlement with someone is reached, and then we can talk about the potential ramifications. So the judge knew, weeks ahead of time, that there was a possibility that the match plaintiffs were going to settle and there would be potential ramifications he was going to have to address when this case went to trial, if it still went to trial, on November 6th, if he granted a continuance. The match plaintiffs settling out meant that EPIC was now presenting the case on its own entirely, so the dynamics were really in flux, but what was not in flux was that Google did not consent to having EPIC's claims tried to a jury. If I can turn to the remedies, because I think the injunction entered in this case really contradicts several first principles of antitrust law in very troubling ways. The court brushed away the entire Trinco line of cases as having no application in the remedies phase when the fundamental principle underlying those cases is that there is no duty to deal in antitrust law precisely because courts can't and aren't in the business of enforcing dealings between competitors. The district court failed entirely to conduct the causal analysis that's required when remedies extend beyond the challenged conduct. This is essentially the same error that the Microsoft court made in the first go-round that the D.C. Circuit corrected up on appeal. In both Optronic, which is this court's decision, and in the Microsoft D.C. Circuit decision, the courts have made clear that you have to have a causal connection before you can go beyond the challenged conduct. The district court also ignored that Google and 53 attorneys general had entered into a settlement agreement where they had agreed to make quite significant changes to the same contractual provisions that EPIC was challenging in this case. And the district court imposed this unprecedented technical committee to decide how Google would build and implement these new services that it was requiring Google to build, develop, and then offer to competitors. All of these conflict with really established first principles of antitrust law and are reasons that the injunction, setting aside the problems with the liability verdict, that the injunction is very problematic. This court has said in the Aerotech case that courts are really ill-equipped to require duties to deal and that that is the core reason for Trinko's liability. In the Metro Net Services case, this court said that courts can't be in the business of ordering sharing when, quote, the defendant doesn't already provide the product. None of the forced sharing... All of that really boils down to what the product is. So, as I understand EPIC's argument, is basically you have all these apps that are out there. The data is out there. The data is in the system. And their expert says it will take less than a million dollars to install the appropriate features for this. So, I guess you say it's a new product. They say it's a variation on what we have. At a minimum, Your Honor, it is new services that require new infrastructure, requires new terms of dealing, it requires new policies, it requires Google to create an interoperability with other app stores, it requires Google to create a mechanism for vetting other app stores so that they can be distributed through Play, which is something that Play has never before done. It is set up to distribute apps, not stores. And I think the district court rejected the kind of cavalier approach that EPIC proposed in its injunction. And you can tell that because, although it didn't give us the duration of time that we asked for, it did say that these remedies, these forced sharing remedies, it said they would take at least eight months to implement it. And it put a technical committee in place because there were going to be hundreds if not thousands of design choices, product design choices that need to be made, business model choices that need to be made. And I think that the technical committee is extremely troubling in its own right, but what it does underscore is that the court was really forcing Google to do something new that Google had not done before. And that is a line that no court, to our knowledge, has ever endorsed as an antitrust remedy. So I'm looking at the state remedies, and it would seem to me that a number of them really parallel the in-app distribution. Would you agree with that? Some of the state remedies I think there are parallels in. There's some nuance and differences. Some of them are quite different. So, for example, the state remedies, which were negotiated by the 53 Attorneys General on behalf of consumers, the state remedies include what's called user choice billing. That's where a user gets to decide to pay for a transaction either through the Google billing service, Google Play billing, or through something else if a developer is offering something else. What the injunction the court imposed does, and notably it's an injunction in a case brought by a developer, is the court orders developer choice billing. And developer choice billing takes that choice away from the consumer and just allows the developer to decide that there may be only one option to pay for something. So there are some very significant differences. This is exactly why a fulsome remedies proceeding was necessary to kind of cover all of this and determine, first of all, what is the problem we're trying to remedy. Well, that was what I was going to ask. In terms of the network effects, the theory, as I understand it, is that by offering the catalog to everybody that now everybody is on a level playing field. And your objection is, yeah, but to put them there requires more than de minimis changes, et cetera. Let's assume that the catalog remedy were sustained. What about the period? What about the timeframe? What did you argue about that? Your Honor, the parties had different views about the timeframe. I don't think that the timeframe plays a tremendous role in the issues that are keyed up for this court. The much bigger issue is that this catalog sharing remedy, and Epic was very clear, the district court never held any briefing on why a remedy was appropriate, the legal basis for a remedy. It just jumped right in to let's start with a proposed remedy and go from there. And what Epic said was let's turn this two-sided market into a one-sided market. We'll do that by giving the play catalog to everyone. That will just restructure the market in this really critical way. But what's really important to understand is that Google Play's catalog is something that was built up through, at this point, 15, 16 years of work, much of which predates any of the challenged conduct in this case. And I'm going to borrow from the Microsoft 2 decision now in saying a district court's job when it's looking at removing the fruits of a violation has to first identify what those fruits are before you can start taking them away. So this is the causal linkage that the district court just skipped right over by jumping straight into let's start with a proposed remedy rather than figure out what is it that we're trying to remedy. So let me just understand. If I create a new app, Cows Have Fun, then not only do I get the entire, and I have an app store that goes with it, although hardly anyone will come to my app store because it's much easier to go to Google Play or maybe marginally Amazon, but I will now have access to the entire catalog that I can put on my app store. Is that right? That is exactly what this remedy provides. That is exactly what this remedy provides. And one of the things Google asked the district court to do was at least put in place eligibility criteria for what would constitute an actual viable app store, make sure it has policies, make sure it has ways for customers to get service, make sure it has ways for developers to express their disagreement with being in that store. And the district court just brushed that all away as well and declined to give any consideration to those sort of very disputed issues about what these remedies were really trying to do and what their scope should be. Let me take up your argument about a court not being able to order dealing with an opponent. I think the argument on the other side has been that you're over-reading Trinko because that was about liability and not about remedies. That once someone has been found to have committed antitrust violations, the portfolio that the district court has for remedies is broad and it's, and I take the point, you know, there was a claim for unlawful restriction of trade, which would mean take down these unlawful agreements, but there was also the monopolization claim that was also found by the jury and the court then has to try to remedy that. And so in that sense, why isn't there discretion for the court to have dealing with other rivals? I remember in Optronics that in that case, one of the remedies was ordering these telescope manufacturers to deal with the plaintiffs. So I do think there are examples of being able to deal with opponents, aren't there? There are. What makes those examples different from this case is that that is where a defendant is ordered to, it's ordered to share with a rival, something that it is already sharing with others. So for example, in the Ford case, there was a requirement to make purchases of spark plugs. Spark plugs already existed. It was just a question of who was going to be buying and selling these spark plugs? Who are you going to be buying and selling telescopes from? What's different here is that this is actually requiring new services that don't currently exist. So I think that in and of itself distinguishes those old cases. Ford Motor required an entire divestment of a whole plant or asset. That was a big remedy. And here there's availability of those. I just wonder, I mean, you're right. It's new and it's different, but that doesn't mean that it can't be rectified. And I'm not hearing that that's the case, right? So it's the access to the Google play store would require, and I don't, you know, I'm not technological in this sense, greater access for others to have it. And so that infrastructure is new, but why is it beyond the bounds of what courts have remedied in the past? So I think there are two reasons. And just to flag that Ford was a merger case and divestiture in a merger case is a very different question about than a monopolization case like this one. But Optronic, I think, gives us that dividing line. And actually Optronic and Microsoft, they refer back to some of the same cases that the district court in theory recited about prying open the market and opening competition. But what the district court did was stop at the pry open the market and focus on what can I do to pry open the market? But what those cases all say is you pry open the market to the extent it was closed by the violation. And that to the extent it was closed by a violation part is extremely important. That is the cabining principle in when you can go beyond the conduct you're talking about, you're under the specific unlawful restraints. And so in order to make that analysis and network effects is what the district court focused on. The court would have had to determine, first of all, what conduct that Google did violated the antitrust laws and had an effect on the network effect. What was that effect? When did it occur? Some of this conduct that was challenged was in 2019 and 2020, right as the case was being filed. And so the impulse to say it clearly contributed to network effects doesn't work because it simply wasn't in place for long enough for it to be a no brainer that there was a network effect. But there was evidence presented to the jury about the unlawful agreements with the tiering system, the HUG contract, other things that insulated the Google Play Store from other app store competitors. With the OEM agreements, having just Google Play be on their devices and not anyone else. And I don't know if it's in the briefing or in the district court's order, but that the combination of those effects entrenched and expanded Google's monopolistic behavior. Why, what more does one need for findings in order to justify the prying open end of the remedy than that? I would point you to the jury verdict. I think you should look at the jury verdict and you should see if you see anything in those eight questions, the jury answered yes or no to that says anything about entrenching anything, enhancing anything, contributing to network effects. You're not going to find it. No, but the jury found the liability. They were not asked, okay, now what do we do about it? So that, that seems like a little bit of an unfair extension of the jury's role. You're saying the judge should have done that. Your Honor, I could not agree with you more. That is exactly what has to happen. It is black letter law that when a jury verdict doesn't give you the facts necessary to enter an injunction or determine whether an injunction is appropriate, the court has to make those findings. That's the U.S. wholesale case from this court. It's the McCarthy case from the second circuit. The district court here treated the jury verdict as you would a sufficiency of the evidence challenge where every disputed fact the jury must have held against Google on. That is not what courts do when they enter injunctions. In crafting an injunction, a court can only look to the jury verdict to the extent a fact is necessarily, and that's the quote, necessarily found in the verdict. So all of these questions about whether there was an enhancement or entrenchment, that's what the remedies proceeding should have played out. In the Microsoft case, when it went back on remand, just to give an example of how this works, the court held 32 days of trial testimony to hear from witnesses to really understand what the impact was of the conduct that had been found to violate the antitrust laws. I'm going to jump in here. We've let you go almost an hour. Do my colleagues have any questions they need right now? One last question, and that's on this app distribution remedy, really two questions. Basically my cows have fun app is required now to be on Google Play, or be permitted to be on Google Play, right, under the app distribution remedy or no? I don't think the app distribution remedy requires Google to put apps in the store unless they otherwise meet Google's requirements. But then those are figured out in terms of security and all of that. You objected to that Google can't really go beyond reasonable costs. It should be nondiscriminatory. But an argument could be made, well, if you have nondiscriminatory, you just gouge everybody. So what is the response to that? Your Honor, the response to that, I think, is that this court has already said that an effort to impose a reasonable cost limitation on a party as an antitrust remedy is inappropriate. And to the extent that there are issues that come up, it really does underscore exactly why these remedies are so troubling, because we are now putting courts in a position of ordering terms of service, setting prices, making product design choices, all the things that courts in the whole Trinco line of cases recognize they are very ill-equipped to do. And the technical committee here does not solve any of that. With that, I'll save the remainder of my already expired time for rebuttal. Thank you, Your Honor. We'll give you a chance for rebuttal. All right, I want to understand we've got some sharing of time. Obviously, I'm not going to hold you to the strict time limit, because we haven't been doing that in this case. But Epic is going first, and then the United States. That's the plan? That's correct, Your Honor. All right. So if I may, Your Honor, please, the court, Gary Bornstein for Epic Games. And if I may, I'd like to move back to liability, unless the court would like to stay on remedy, and hopefully we'll get to both over the course of the argument. I'd like to start with the single brand market issue. I think part of the reason we're having so much trouble on this today is because it wasn't presented to the jury below. I heard more about the single brand market theory that Google has here in this courtroom than the jury or the district court ever heard. There needs to be an evidentiary foundation that's presented to the jury before it's appropriate to give an instruction on that particular theory. And I would direct the court to the Skidmore decision. It's an en banc decision of this court. And it's very clear that a plaintiff or a defendant is not entitled to an instruction based on a legal theory that was not presented to the jury. And as the district court said, the idea of an aftermarket was a complete ghost in the trial in this case. It's not a question of magic words. That's true. But the concept was never presented. It was something that was not presented by any of the experts through discovery or at trial. No expert was cross-examined about the subject. It literally never came up. It would have confused the jury to no end to suddenly be sent back into the jury room and presented with an issue that it had never heard about once in what was already a relatively complicated trial. So we think that is dispositive to the question of the single brand market theory. That's not dispositive. If that's not dispositive, Your Honor, we're the court to go past that. It does fail on the merits as well. The district court was right to reject it on that ground as well. I think the analogy that Judge Forrest used during the first part of the argument was an apt one, that Android is a component. It's something that is licensed to the makers of the brands. It's like Windows is licensed to Dell and Lenovo and Acer and other laptop makers. We would never call that a single brand. Samsung, Motorola, the Chinese brands that Judge McKeown referred to like Xiaomi, they all compete with one another. That's what consumers purchase. They purchase a device. In fact, as quoted just a little bit ago, that was the testimony from the experts at trial, that Android flows from the purchase, quote, of a device. Counsel just read it to the court this morning. That's from page 1256 of the record. Google, with the small exception of the Pixel device, Google doesn't sell devices. Google doesn't transact with the users before they purchase the durable good that you need to have for a single brand market. Google transacts with the original equipment manufacturers, the OEMs, like Samsung, and it transacts with them through a license agreement that consumers have no visibility into and never engage with. But the reason that it's not a single brand market from the perspective of the user is the aftermarket, as Google has defined it here, is not confined to a single brand. It happens across Samsung devices. It happens across Motorola devices. It happens all across the landscape. In every single case, every single one cited in our brief, every single one from this court, and every single one on page 41 of Google's brief, where the single brand aftermarket framework was applied, was a case in which the defendant was the sole seller of the good on which the aftermarket then supposedly functioned. So, for example, the stove that Judge Forrest mentioned, the seller of the stove, a single particular brand of stove, Kenmore, would be the product in the foremarket, and the aftermarket would be the servicing of Kenmore stoves. So in Kodak, it was the servicing of Kodak copiers in this court's decision. In NewCal, it was the servicing of Icon copiers, and so on and so on. Well, there seems to be some ambiguity, at least as I read the briefing, that either the foremarket is the smartphone market that has Android, or Android itself stands out there as a definable foremarket. So I agree, Your Honor, there is ambiguity on that point, as I say, because it was never developed below. And I would point out that the reading of the Epic v. Apple decision that we heard this morning, suggesting that this court in that decision reached a conclusion one way or the other that the operating system was the proper foremarket, that's incorrect. I would direct the court to pages 978 and 79 of this court's decision in Epic v. Apple. That's the portion of the opinion where the court addressed Judge Gonzalez-Rogers' finding, which the court found to be erroneous, the finding that you couldn't have a market where the item in the market was not sold or licensed for money. The court said that's not right. We do have markets like that. Microsoft was an example. But the court does not take a position in those three paragraphs on those pages on what the proper foremarket was. It didn't need to do that. And so there's no... Well, I thought there was a determination that Epic hadn't met its burden in any event. That's exactly right. And that's why the court didn't need to make a determination. The court found Epic hadn't actually satisfied its burden, and that was dispositive as far as that decision went. Well, I understand Apple's point to be that you have this prior trial, and the relevant market there was the competition between Google and Apple over the mobile game app distribution. And you have both theories. Essentially, you're arguing for there's ecosystems. There's the Apple ecosystem, and then there's the Google ecosystem, the Android ecosystem. Is there a risk of inconsistency between the trials with having different outcomes like this? That seems to be the concern that's been raised. So the answer is no for a few reasons, Your Honor. The first one is for there to be preclusion, which is really the context in which this issue is being presented to the court. There needs to be an actual inconsistency so that the two results can't both be correct at the same time. That's not true here. You can have overlapping markets, even if one accepts just hypothetically for a moment that the finding in Epic v. Apple about the nature of the market were carved in stone. That would not preclude, because it would not be inconsistent with, the existence of the markets found by the jury here. Let me explain why that is. When you define a market, and the reason that we really don't have the same issue presented here, you start, as this court has said, in Epic v. Apple, for example, in Optronic, you start with a narrow set of products, the ones that are at issue in the complaint. And you slowly look for substitutes a little further and further out from the center to see which are the products that consumers can turn to in order to defeat an exercise of market power. Or you stop when you get to a place where a hypothetical monopolist can harm consumers by engaging in some conduct. That's a market. So here you start with Google Play. The closest substitutes are the other distribution outlets, the other stores or sideloading that are available on Android. And if a hypothetical monopolist, or in this case an actual monopolist, is able to exercise market power in a way that harms the consumers and the developers that use those products, you stop, because you found a place where consumers can be harmed. If you keep going, if you broaden it and you bring in Apple, you're going to miss the ways in which Google can cause harm to users and developers, as Judge Forrest said, one level down in the Android world. And you don't want to do that, because then you are missing competition injuries that the antitrust laws are intended to protect against. And that's why you see in lots of antitrust cases defendants arguing for broader markets, plaintiffs arguing for narrower markets. It's because if you make the market broad enough, as Google would like to do, you miss some of the harm to competition that occurs in the properly defined narrower market using the methodology spelled out on page 975 of the Epic v. Apple opinion about moving out iteratively from the narrow products that are at the center. And it makes sense in this case to do it that way, because unlike in Apple, where Apple itself owns the entire vertical, soup to nuts, the hardware, the operating system, the store, Apple has an incentive to do everything it can to maximize how well Apple does, to maximize Apple's profits. Google's incentives are entirely different, because Google doesn't own the whole ecosystem, the whole vertical. Google's incentives, like every company's, are to maximize Google's profits. And Google does so, as the experts explain to trial and as the jury found, by impairing other Android participants. That has the effect of degrading Android. It makes the pie smaller, but it does make Google's slice bigger. So it's entirely within Google's interest to do that, because Google is amplifying its own profits, even though others are suffering. And so focusing on Android, as the district court and ultimately the jury properly did, allows you to see the ways in which Google is harming competition as a whole, even though it's benefiting itself. And the premise of the antitrust laws, after all, is that competition makes things better. That's kind of the policy rationale behind the Sherman Act. And so if you accept that rationale, which I think we have to, as a congressional policy determination, allowing competition to flourish on Android will make Android better. And so I come back after a while to Judge Sanchez's question again. By making Android better, by allowing that competition to flourish, you're actually improving its position against Apple. Google's theory has always been that Android would be harmed if it can't continue to engage in this anti-competitive conduct, if it can't continue to coerce exclusive deals from OEMs, if it can't pay $360 million to a developer not to open a store, if it can't require OEMs to make Google Play the most prominent and preferred placement store on the device. Google says all of that would be bad for Android. No, all of that would be bad for Google. We do accept that. Monopolists shouldn't engage in unlawful monopolization. But it would be good for Android to remove those restrictions and allow Android to perform better, and more importantly, allow consumers and developers who use the Android platform to get more out of it, because the competition that Google is suppressing would no longer be an issue. On your after-brand market, it seems to me, by in effect defining the app distribution and the in-billing as Android, haven't you defined a single market? You start out and say, well, there's really no single brand in the hypothetical after-market. But isn't Android the brand? No, Your Honor. As I think Judge Forrest's apt analogy makes clear, Android is one input into the devices that are the brand. I mean, Google says in its brief on page 45, it's a device for market that they are arguing for. A little different from what we heard today, but that's what's in the brief, not something we heard at trial one way or the other. Android is one piece that goes into that device along with a camera and a touch screen and all the other things that OEMs have to pull together to make their product. So no, the thinking about Android as the single brand is inconsistent with the way consumers purchase the product, whether they actually purchase from Samsung or they purchase from one of the other OEMs. And it's inconsistent with the logic behind the single brand after-market theory. So to talk about the logic that's spelled out in cases like Kodak, the reason that single brand after-markets are uncommon in the antitrust cases, is that ordinarily one presumes that when you transact, when a consumer transacts with a particular seller, the consumer knows what restrictions it's getting itself into. You know what kind of hot water you're getting into if you buy a particular product. And that makes sense and that's why Apple came out the way that it did. I'll reserve on whether it makes sense or not, but that was the decision of the court. In Apple, that was the decision in Kodak about dealing with it that way. That was the decision in NewCal and, again, all the other cases that are cited. Here, there's no reason to apply the same presumption because the consumer's not purchasing, quote-unquote, from Android. A consumer is transacting with each of the different OEMs to buy one of these, to buy a product, a durable good. And that's what you do need in order to fit yourself within this single brand after-market framework. So the district court was, aside from the waiver issue and the lack of an evidentiary foundation, which we think is dispositive, but aside from that, the district court was quite right not to apply that theory here given the different structure of the Android market. And, by the way, it happens to be the case, each of the OEMs has a somewhat different relationship with Google. Google's agreements with these OEMs are not one-size-fits-all in every single respect. Samsung is a pretty big player in the market and it has a little more muscle to fight back against Google and get slightly different terms. And there's no way that consumers know all that when they buy a Samsung device. There's no way that consumers know what the different iterations of a license agreement are. So there's no reason to apply that presumption of knowledge, which is the foundation of the single brand after-market theory. Would you turn to the trial issue in terms of whether this should have been to the court or to the jury after the settlement of all the other damages? Yes, of course, Your Honor. So we think that the district court was well within its discretion and it is a discretionary determination in our view. What's the authority for that? The authority for it being a discretionary determination? So it's a trial procedure question as to whether or not a party withdrew its consent. Certainly the interpretation of Rule 39C, that would be a legal question. What does the rule mean? For example, Your Honor posed the question earlier about how you interpret the word action. That would be a legal question. But the factual question as to whether or not a party sufficiently withdrew its consent and in particular whether it withdrew its consent at a time that was appropriate, that's within the trial court's ordinary management of its courtroom. I think you're right that the trial court would get discretion in terms of whether a withdrawal of consent occurred or not. But on this record, I think the court acknowledged that there was a withdrawal of consent and then the issue was what it's going to do about that. And I go back to the rule. If Rule 39 is what governs this context, what in the rule gives the district court discretion to look at something that it acknowledges as a withdrawal and say, I'm not going to accept that? So a couple of things, Your Honor. First, I just start with the operation of the rule. This court made clear in United Press Associations v. Charles that Rule 39 doesn't actually prohibit the holding of a jury trial. Rule 39 like Rule 38 together are about preserving the right to a jury trial under the Seventh Amendment and the circumstances in which a party is entitled to it. There's not a constitutional right to a bench trial. Rule 39 itself, however, in thinking about consent to get to the core of Your Honor's question, is a fact-based question in two senses. One, which Your Honor referred to, is whether consent is withdrawn. The other is in the district court's management of the courtroom itself, whether the court could conclude that it was withdrawn too late. We know that there are cases where this court has found already, like Tomlinson Black, that consent was withdrawn too late. This court upheld the district court's determination in Tomlinson Black that consent was withdrawn too late. That's an unpublished decision, right? It is an unpublished decision, Your Honor. It's all we have to go on. When, in your view, given how this was this large case, we have the MDL and then it keeps shrinking. Now we've got the various settlements that people drop out. When, in your view, was the earliest that Google could have said, we don't have any more legal issues here, we only have equitable? When was the earliest it could have withdrawn? Does Your Honor mean the latest that it could have withdrawn? I'm sorry. Well, no, actually first the earliest, then the latest. Because how would it know? Well, it certainly could have made clear from the very outset that it believed that a jury was not appropriate on Epic's claims. Google has truly excellent lawyers, obviously, and it understood the landscape. And there was a lot of discussion, and this is discussed in our papers, as part of the case management process where the district court expressed its preference to have a, and I quote, a jury trial first. Epic was actually looking to proceed faster than the class plaintiffs because there was going to be class certification, and Epic was concerned about having its claims be delayed. And the district court said no. The district court said we're going to have a jury trial at least on some of these claims because we have them. That goes to why I didn't say the latest. I said the earliest. So you're saying they should have said at the pretrial conference, oh, and don't forget if some miracle occurs and we're the only people left standing along with Epic, therefore we don't want a jury trial. Well, it's not so surprising a comment for them to have made, Your Honor. We had extensive discussion, again, discussed in our briefs with the district court about how to structure this very complicated constellation of parties. One of the proposals that was on the table was that there would be a jury trial on claims for damages, and there would be a subsequent trial to deal with the equitable issues. Google signed on to a submission to the court in May of 2023 that we all signed on to that said there would be a jury trial for all plaintiffs on all claims. That was the determination. So did Google consent at the outset? And that's a disputed point. But when it comes to withdrawal, I don't know how those facts really matter other than you're saying it's too late. I go back to the rule and I don't know what, and the rule tells me that I think about too late. But coming back to Judge McEwen's point, we have the month before all the settlement happens, and was it a month? Maybe it was a little less than a month before the trial started, that Google is on the record saying, hey, this might happen. Match might be out of this case, and then we're going to have to think about how it goes forward. And then when match is out of the case, my understanding from the record is that pretty immediately Google says, that's now happened, and we have to change course. Do you dispute those sort of procedural facts? No, that's an accurate description of the timeline. What I'd add to it, however, Your Honor, is the important fact that the day that Google said, hey, we withdraw our jury consent, that was the day before 100 people showed up in the courtroom for voir dire. That would have a lot of resonance to me, if the settlement had happened two months before and Google had waited around to bring it to the court's attention. But if Google is bringing it to the court's attention immediately after the settlement happens, what does that do to anything? The question is how close we are to trial, Your Honor. We were literally days away from starting the trial. What's the prejudice to ethics? The prejudice, Your Honor, is all of a sudden, we have to change our trial presentation entirely. We've been planning this case to try it to a jury. Trying a case to a judge versus trying a case to a jury is a very different enterprise. I was trial counsel in this matter. I can assure Your Honor we would have made a number of different choices in terms of witness order, what the expert testimony would have looked like, what the opening statements would have looked like if we even had them. There are a tremendous number of changes you need to make in order to tailor this. Was there a continuance brought up? I know you have all these people that are pre-screened and you've got them hanging out, not yet showing up at the courthouse. Was it ever talked about, let's have at least a continuance to resolve this situation or if it turns into a bench trial, then we would have a continuance. So I don't remember, Your Honor, one way or the other whether that was discussed. That would make sense to me as a trial lawyer. You'd figure out could this case be continued one way or the other and would it be prejudicial either to Epic or Google. Set aside, Your Honor, whether the timing of the match settlement was strategic, which I do believe it was, in order to try to disrupt the trial. I just don't remember one way or the other about whether the continuance discussion had happened. One point I would make, however, is to go back to United Press v. Charles. This court has already held that the holding of a jury trial when the parties don't consent was harmless error. In that case, that's a square finding of the court, that it was harmless error. And it makes sense that it be harmless error because there is, as I said, there's no constitutional right to a bench trial. And if there were, excuse me, the only prejudice that Google has asserted so far about the holding of a jury trial is the supposed lack of factual findings then to support the injunction that was entered. Set aside our disagreement with the premise as to whether there were separate set of factual findings. That's not a flaw in the liability issue. They're bifurcated. They're separate points. If this court is to decide that the district court didn't do a good enough job laying out the facts on which the injunction was based, then the court should proceed accordingly. But reversing liability judgment or vacating liability judgment is not necessary in that circumstance because the flaw would simply be, if there were a flaw, in the foundation for the specific injunctive remedies that the district court ordered. It wouldn't call the verdict itself into question. That's sort of why I asked your friend across the aisle, what do we do if we think that there's a problem here? What do we do about it? It seems like one option would be to do a limited remand and ask the district court, this shouldn't have gone to the jury. It did. Now what? Because I was looking at the judgment as a matter of law ruling post-trial and trying to figure out, is it harmless? Is the district court looking at this? Is the district court signaling to us exactly how it would have decided this case if it was deciding the case as opposed to the jury? I'm not sure that I can get there from the post-trial ruling. But is that a procedural option that we would have, is to send it back to the court and say, tell us what you would do? Well, I think, Your Honor, what the court would do is, based on Rule 39C, say, treat the jury verdict as the decision of an advisory jury. There's no question the court could have had an advisory jury here. What's the problem with doing that and then clearing up the potential procedural problem? There are two problems. I mean, well, I'll take one away by assuming that there were error. But assuming that there were error, Your Honor, the problem is continued delay in bringing relief to a market that has been suffering under anti-competitive behavior for the better part of a decade. Sending it back for the district court to do the homework assignment of writing an opinion is completely unnecessary. And my friend made the comment earlier that there's a problem here because we don't have findings on market definition and findings on competitive effects from the district court the way we did in the Apple case sufficient for this court to assess, and I quote, the liability decision. Well, juries decide liability in antitrust cases all the time. There's no reason why this court needs to have a Rule 52 order to review a liability decision even in an antitrust case. So sending it back for the district court to put together a long opinion, if it needs to be long, based on an advisory jury verdict is, in our view, make work. Well, that goes, I just want to hear a little more expansion on your argument that it's really a harmless error in any event because it's not a question of right to a jury trial. It's like the obverse of that in some respects. Well, that's correct, Your Honor, and I take that from United Press v. Charles, which is, as I say, it's a decision of this court. And there is no case that has been cited to this court, no case of which we're aware, in which a jury verdict has been vacated as a result of an assessment that it should not have gone to the jury and it should have been tried to the bench. To be sure, there was a claim in Google's opening brief that the Dunmore case went down this road. Google said in its brief that Dunmore was a case where the plaintiff refused to consent to a jury trial in the bankruptcy court and the bankruptcy court went ahead and tried it anyway. That's just not true. That's not what happened in the case. It's a misdescription of the facts of the case. There is no, in that case, there was no trial at all. In fact, the plaintiff wanted a jury and didn't get it. That was why this court reversed. It was the opposite. But there is no case in which this sort of homework assignment to go back and write a Rule 52 order has been entered and in which a jury verdict of liability has been vacated on the ground that it should have been tried to the bench. Well, let's jump ahead to the injunction. If we were to determine that there were infirmities in the injunction and it needed a remand, do you think that that would intersect at all with this argument or the notion that Judge Forrest raises, well, if we're going back for the remand on the causal or the scope of the injunction, how it affects network effects, would that counsel for also having the judge make Rule 52 findings on the liability? I don't think so, Your Honor, because, as I say, under Rule 39C, there's no question the district court could have had an advisory jury here. And if we're going to send it back for factual findings sufficient to support the injunction, again, we don't think that's needed, but if it's going to go back for that, I think that it can go back for that and that alone the advisory jury decision would remain and all you would need the district court to do at that point would be to enter sufficient findings based on the advisory jury conclusion to support a liability verdict for this court's review. I want to ask about your injunction then because let's assume liability is established now. We have the district court trying to figure out, well, what do we do about this? Sort of the open sesame of my catalog, including whatever bells and whistles needed to be added for Google Play to be able to do that, I'm having some trouble linking that to the network effects because it's a global solution. So I would be enlightened by your description, please. Okay. I'm happy to take that on, Your Honor. So there was a lot of evidence at trial about the network effects that were created by Google's conduct. I would direct the court just as a start to the district court's discussion of it at page 16 of the excerpts of record. But it appears regularly throughout the trial there's this cute footnote in Google's reply brief saying the words network effects only show up once in the trial transcript, but the description of the chicken and egg problem and barriers to entry and two-sided markets and all of it is discussed again and again and again. Right. You need apps, you need users, that whole bilateral discussion. Right. And so what the catalog access remedy is designed to do, and there's an extensive record on this from the remedies proceedings where there were 10 witnesses who testified over the course of two days and there were hundreds of pages of submissions from the parties, both fact witness declarations as well as briefing. What that evidence showed is one way to overcome the barrier created by those network effects, which Your Honor called the bilateral issue, is to jumpstart on one side the access to one of the pools of things you need. So, for example, you need a lot of users in order for developers to be interested to put their app on your store, but you need a lot of apps in order to have users want to come. So what the catalog access remedy does is it gives the store a critical mass of apps so that users will come to it. So if, for example, I'll take a real example rather than a hypothetical one, Amazon. That was just the one I was going to bring up because that's the one that there is testimony about. Right. Well, there's actually testimony in the record about several stores. Right, but that's really the most prominent because of what happened. Right. So Amazon, as the record shows, had difficulty getting users to come to the store, among other reasons, because it had an insufficient number of apps and couldn't get the developers to come because it didn't have the users. If the catalog access remedy is granted, Amazon will now be able to offer to potential users the full app catalog that exists on Google Play. So a user who previously said, I'm not going to download the Amazon store because it only has a small number of apps and who needs it, can now go to the Amazon store and get everything. Now, one thing to make very, very clear, Google still gets the money. This catalog access remedy does not take a dime away from Google. So the way it works is if they use it. It just potentially enhances Amazon, right? It enhances Amazon's attractiveness as a store because it gets it past that chicken and egg hurdle created by the network effects, but it is then entirely on Amazon to enter into direct relationships with each of those developers and have the developers put their apps directly on the Amazon store so that when a user goes to the Amazon store and says, hey, I like your cows app, if it's on the Amazon store, they'll download it from Amazon and if they make purchases in the cows app that some portion of it may go to Amazon. But if it's not on the Amazon store, if Amazon doesn't do the work to build a relationship with the cow developer and the user goes and downloads the cow app from Amazon solely as a result of this catalog access feature, the money is going to go to Google. Google still gets the money unless and until each of its competitors, the other stores, does the work to build direct relationships. One of Google's arguments is that the district court needed to make more specific causal connection findings, distinguishing Google first mover advantages that would give it, for lack of a better term, legitimate network effects versus ones that derive from anti-competitive behavior. Do you agree with that, with that framing? And if so, how did the district court comply with that? I agree with Your Honor's framing of Google's argument. I disagree that that is something that the district court was obligated to do. I will say I think the district court did a fair bit of that as well. So let me take that in pieces. First of all, what the district court looked at is the whole range of conduct, and it spelled out both in the order accompanying the injunction and in the judgment as a matter of law opinion, which is incorporated into that order on the injunction, and found that what Google did by entering into these exclusives and these agreements with developers and agreements with OEMs was to maintain, enhance, and therefore entrench its network effects. And a perfect example of that, there's a discussion on page 40, it's an excerpt of record 40, which is from the JML opinion, of something that there was a lot of discussion about at trial called contagion. There was evidence showing that Google was concerned that if one app developer, one significant app developer, chose to start its own store or chose to put its app on a competing store, then others would follow. There would be contagion. And Google was concerned that this would lead to other stores getting traction because they'd be getting over the network effects hurdle by amassing more and more stores and competition, if I could take the analogy too far, kind of growing like a virus and metastasizing through its contagion from Google's perspective. And so what Google did is it engaged in one of the pieces of anti-competitive conduct that was found by the jury, is it paid app developers not to launch their products exclusively outside the Google Play Store. And what that did is it shut down the contagion. It prevented the conduct that would have eroded the network effects from which Google benefited. So that's why the district court said, and the district court cited to the Amazon example, and there's a lot in the record, but that's why the district court said, this is page 17 of the excerpts of record, that Google's conduct magnified, enhanced, entrenched, maintained those network effects. Now, to take the second part of Your Honor's question, the idea that a party would need to go through and quantitatively disentangle how much of the network effects were carryovers from conduct that happened before the anti-competitive conduct period under review began, versus how much of those network effects were the direct result of conduct that happened during the course of the period, is putting a burden on the district court that is way higher than is appropriate when the party has been found to violate the antitrust laws. The benefit of the doubt does not go to the wrong door. We have a situation here where the district court is vested with broad discretion to identify what needs to be done in order to fix the problem. Under optronic, as long as it's a reasonable means, those are the words in the case, a reasonable means that the district court has identified to address the consequences of the unlawful conduct, it should be upheld. I've been trying to parse through that paragraph in optronics because it does have the causal connection sentence, and then it follows with citations to prior Supreme Court authorities that talk about this broad discretion and the reasonableness standard on our end. How do we look at what should be reasonable? It can't be so broad that it's meaningless, but how should we apply a reasonableness standard to review the remedial relief ordered? I think the starting point, Your Honor, is the tremendous discretion that's vested in the district court who's familiar with the trial record and the kinds of anti-competitive effects that were found in the district court. And this court is familiar with that kind of abusive discretion standard in an injunction context. There needs to be some kind of identifiable nexus between the conduct at issue that was found to be anti-competitive and the harms that are sought to be remedied. Not necessarily the specific action that's being required to be taken. So, for example, in Massachusetts v. Microsoft, Microsoft was ordered to make available APIs and other software interfaces that it had not previously made available and that the court had expressly said played no role in the underlying antitrust violation. What was approved by the D.C. Circuit in Massachusetts v. Microsoft was a remedy that required Microsoft to take these steps because it would help restore competition, even though the withholding of those APIs was not something that had been challenged as a source of anti-competitive harm. And the reason that was upheld, and I think this goes back to your question about how to think about reasonable means, is because the court was able to draw, like the district court did here, a nexus between the harm that was caused, the maintaining the entrenching of those network effects so that others could not compete, and the remedy being ordered, which was a way to get over those network effects and help other competitors try to get off the ground, even though they didn't have that critical mass of apps. I should say, by the way, there are two remedies that are the subject of this causation argument in Google's papers. There's the catalog access that Judge McEwen asked about, but there's also this store distribution remedy, and the district court grounded this store distribution remedy both in the network effects issue, but also and separately on page 18 of the excerpts of record in the friction that Google had imposed. And there's at least a paragraph of discussion, factual findings by the district court, in its order accompanying the injunction, as to how there were steps that Google took to make it harder for users to obtain apps outside of Google Play by imposing technical friction and this court is very familiar with the concept because it comes up again and again in cases, but extra steps that you need to go through to download, settings you need to change, warning screens you need to click through, and the district court found that as a result of those frictions, users were dissuaded from going to Google Play in the first place, going outside of Google Play in the first place, and this store distribution remedy is intended to get past that by making stores available on Google Play, so people can go and they can not have to suffer through these various frictions. So that's an independent set of factual findings from the district court to support the store distribution remedy separate from, but above and beyond and independent from the network effects findings that also support that same remedy. So as you know, we've received many amicus briefs in this case and several of them have spoken to concerns about privacy and security with opening up Google Play to third-party stores or other things or even extending the catalog out in a way that would make the systems more vulnerable either by foreign entities or others, and in one of the briefs there was a concern raised that the district court's order seemed a little bit too onerous, that security measures couldn't be taken unless they were narrowly tailored and needed. Can you speak to that issue? Is there a possibility that the court is applying too onerous of a standard for purposes of this broader point? Sure, Your Honor. I'll start just by observing that this was litigated the way it's supposed to be litigated in the trial court with evidence, with witnesses, with submissions from the parties, including fact declarations, expert declarations in briefs, and amicus briefs that come in and provide untested facts I think should be taken with appropriate skepticism, especially given the source, as one of the amici who submitted and our source pointed out about who submitted amicus briefs for Google. But setting that aside and taking on the merits of Your Honor's question, yes, this was addressed in front of the district court in terms of what the security risks are and aren't. There was extensive evidence presented below about the ways in the past in which Google had misused security as a justification, as a pretext, for engaging in any competitive behavior. There's some discussion of that at page 46 of the excerpts of record, which is the district court's judgment as a matter of law opinion. There's evidence we cited in our brief at pages 90 and 91 showing the same thing, that Google has misused security, but also that its remedy arguments overstated the security concerns that now are being echoed in the amicus brief. I think you're on. Oh, apologies. On that point, the whole point of the store distribution remedy is then that Google will be able really to soften any impact by requiring and looking at privacy, security, and any other features, illegal sales, that sort of thing. That's exactly right, Your Honor. But then they can charge for the privilege of doing that. So that brings me to my price question. There's this argument between, well, three parts to it. One between a reasonable cost and another that they argue for is non-discriminatory. But when you address the reasonableness, which is where it is now, it also underpins and talks about Google's costs as a benchmark for reasonableness. That seems like a direct price regulation. So, Your Honor, two points on that, which I think will dovetail back to part of my answer to Judge Sanchez as well, but I'll start with that point directly. There's no prohibition in the law on antitrust remedies that require reasonable pricing. We see that in Glaxo from the Supreme Court. We see that in international boxing from the Supreme Court. That's relatively uncontroversial. The cost issue is a way of ensuring that Google doesn't do exactly what Your Honor suggested and gouge everyone in order to make this remedy ineffective. But then it wouldn't be reasonable pricing. So cost isn't the only foundation for how you determine reasonableness. So now you have the court saying, your reasonable prices, we're also going to inject this factor, the court-ordered factor. The way I understand the use of based on actual cost, which is the language in the injunction. It doesn't say limited to actual cost. It says based on actual cost. I think it's intended to get at the following issue about which there was a lot of testimony both at the remedy phase and at trial. One way that Google could charge for this security process is to charge all stores the same amount. If you have a store, you put it on. Let's say you have 1,000 apps on your store, you get charged the 1,000 app price. You have 10,000 apps, you get charged a higher price because it takes Google more work. That would be kind of cost-based. If they have to do more work, they can charge a little more. An alternative way, hypothetically, of pricing would be if you have a store that's really profitable, then Google's going to take 5% of your profits and it'll take 5% of one person's profits versus 5% of someone else's profits, and then it's not charging based on its cost. It's taking, essentially, a revenue share. Then it's going to charge for its remedial software enhancements based on a percentage? I'm saying that's what the district court is intending to prevent by using based on actual costs. If there were a revenue-proportionate charge that were being levied by Google on stores for this security review, that would undermine the purposes of the injunction. Isn't it relevant at that point, is that how the market works generally, or does the market work at a percentage cost, and that's how just generally business is done in this context? If it's the latter, then we get back to Judge McEwen's point of, how is this not the court setting prices? Right now, this security review of other people's stores is not a market process. There is market review that Google does of the apps that are placed on Google Play currently. Every time it comes, somebody wants to be on Google Play, they do that. They do that then for the apps. Right now, they don't take stores, and the district court injunction is requiring stores to be accepted. But when apps come and are placed on Google Play, there is a review that's done, and there's evidence in the record of the costs that Google bears, that's at 9 ER 2066 through 2067, as well as 9 ER 2026. And the cost-based numbers, the way that Google currently charges, is exactly what it can, excuse me, the amount that Google currently spends on this, is exactly what Google can continue to spend when it goes forward. The reason it's not to use the pejorative price regulation is it's intended as an anti-circumvention provision, because if there were... And reasonableness doesn't do that? Well, again, I think that goes back to the notion of whether they're going to be charging on a revenue-proportionate basis or whether they're going to be charging based on what they're actually expending. I mean, to take one step back, Your Honor, this entire issue, this review of security and especially the pricing, this was an accommodation to Google that the district court gave. Epic in the... They might not see it quite as an accommodation. Well, I'm certain, Your Honor, that they view the opportunity to review for security as an accommodation and the opportunity to charge for it as an accommodation, because they argue for it quite vociferously in the district court. Obviously, they didn't want this remedy to be entered at all, but what they said to the district court is, if you are going to enter a remedy like this, please, we need to be able to do these two things. We need to be able to do a review and we need to be able to recover our costs. And the district court said, I'm going to let you do that. And I'll point out the district court did it over Epic's objection. This is by no means an everything Epic wanted, Epic got kind of injunction at all. What about the time frame? Addressing both the catalog store and the distribution. How did that come about? And it does seem to me that this catalog access is, what, three years? Is that right? That's correct. They're both three years. And how did that get determined? So the bid and the ask, so to speak, in the trial court was that Epic, through its experts, requested a six-year period. The justification for the six-year period was it's about two ownership cycles of a phone. Most people, on average, hold their phone approximately 2.7, 2.8 years before they get a new one. And the idea was that having two cycles, according to the expert economic testimony, would be sufficient to allow these remedies to take hold and let competition flourish the way the district court intends. Google obviously did not want the remedy to be entered at all and didn't proffer a proposed time frame in the event the court were to enter it. And what the district court did is it entered essentially one cycle, one ownership cycle. The court said during the hearing that we had in August of 2023 on this very remedy, the court expressed the view that six years was longer than the district judge believed would be appropriate, made the observation, as our experts made as well, that there's not a specific science to it. There is a degree of judgment and discretion about the amount of time necessary for these remedies to take hold. And what the district court ultimately did was settle on one phone ownership cycle rather than two. All right, we're approaching an hour again. Any other questions? All right, thank you, counsel. I'm grateful for the court's indulgence. Thank you. All right, we'll hear argument from the United States. I think on this one we'll set the clock at 10 minutes, which is twice what you guys agreed to. And then I'm going to ask Mr. Lawrence to stick to that time unless the bench is taking you over. Thank you for that, Your Honor. Hey, please, the court. David Lawrence on behalf of the United States of America. We very much appreciate you hearing from us today what's already been a very robust argument on important issues. District courts have broad authority and discretion to craft monopolization remedies. And when the law has been violated, the remedy must restore competition. We're most concerned today that Google's arguments threaten those bedrock principles. We'd like to urge this court not to adopt categorical constraints proposed by counsel here on the remedial discretion of the district courts below. We're concerned that those constraints, if adopted, could prevent future courts from doing their duty under the law to restore competition in monopolized markets. I'd like to focus on three examples today, the refusal to deal issue, causation, and the technical committee. So first is the refusal to deal, and this has been addressed at great length in the briefing. Google would like to import constraints in Trinco into the remedies phase. But Trinco's a liability case, not a remedies case, and Optronic dealt with a very similar question and disposed of it by approving the supply remedies related to telescopes in that case. I want to underscore that the difference between liability and remedies with respect to these kinds of considerations discussed in Trinco is a distinction with a difference. With liability, you're talking about planning the behavior of all potential monopolists for all time, because that's what liability rules do. That's what interpreting the Sherman Act does. When you have an independent violation of the law, the scope of the court's intervention is much narrower. It pertains to a single party, and it's in place for the limited duration of time necessary to, as the law requires, restore competition. And that authority, the remedial authority, is very broad, extending not only to ordering dealing like in Optronic, but to restructuring the entire industry with divestitures, as Judge Sanchez pointed out, occurred in Ford. I do want to pause there because your colloquy with counsel brought up the fact that Ford was a merger case, such that, you know, you're just undoing the merger. That's not true for all of the divestiture cases on the books. United Shoe is a great example of a case where there was no merger related to the conduct. It was a Section 2 case with a wide variety of conduct, not dissimilar from here. The Supreme Court, nonetheless, thought it absolutely appropriate for the district court to consider a divestiture that would create a whole new shoe company out of whole cloth as a means of restoring competition to the market. Second, unless there are questions on the Trinco issue. The causation question. We've talked about that some this morning. Google is seeking to limit remedies meant to open a market with network effects solely to the quantum of network effects caused by the unlawful conduct. But that's not the causation remedy. That paragraph sets up a reasonableness inquiry. So in our view, the degree of intervention, the nature of the remedy, should be reasonable in light of the strength of the showing that the conduct caused the maintenance of the monopoly. Our concern is that Google is asking for a very different kind of causation requirement. This causation requirement would limit courts to addressing only those barriers to competition caused by the unlawful conduct. Here, the network effects barrier to entry. But courts have often found it, and will often find it, expedient to address their remedy to some barrier to entry other than the specific one involved in the case. And their discretion to do so when reasonable should be preserved. My counsel for Epic here mentioned the Microsoft case. That's at 168 to 170, Massey, Microsoft. I think that's a really important set of provisions to look at. These are related to sharing APIs and communications protocols. At the time, the Internet was just emerging, and there was a thought that a closed system of Microsoft communications protocols among PCs could inhibit competition. That remedy required Microsoft to disclose those APIs and communications protocols, notwithstanding that, quote, non-disclosure of this proprietary information had played no role in our holding that Microsoft violated the antitrust laws. The court, nonetheless, thought it a reasonable means of recreating competition in the market, and it cites the exact reasonableness requirement on which Uptronic relied at the end of that paragraph. I think this case also underscores the need for courts to have the discretion to look to barriers to entry that aren't necessarily the same ones caused by the unlawful conduct. Here, we have unlawful conduct that affected the point of sale, whether or not competing app stores were preloaded onto Android phones. Those Android phones are in the hands of millions of Americans today. Restoring competition just through that avenue could become more interventionist, loading app stores directly onto the phones without the user desiring to, interacting with the point of sale in a really interventionist way. This court found what we think is a very reasonable means of opening up competition. It took the app stores that are already there on the phone, the Google Play store, and it said, if the customer wants to download a competing app store, let it use that store for a limited period of time as necessary to reopen the market to competition. Next, I'll turn to technical committees unless there are questions on causation. Great. So we're also very concerned that there not be artificial limits placed on the use of technical committees in these kinds of remedies, particularly in high-tech markets where a district court can really benefit from the security or technical review of a committee below. We wanted to have the authority to craft that remedy. And I'd point the court to Besser in which the Supreme Court looked at a very similar kind of technical committee to the one here. Not precisely identical, but similar. And that technical committee helped to determine reasonable rates for the patents that the Supreme Court agreed should be required to be disclosed. Should we not be concerned at all that the technical committee includes members of competing organizations? That seems to be a new step in the other cases that I've seen that have technical committees. I agree with you, it makes sense to have something like this particularly in the technology space to assist the court in administration of remedies. But that does seem to be an extension of where we've been before. Your Honor, I'd agree with you that there's no exact corollary for this situation. So the other technical committee we'd point to is the Microsoft one which didn't involve competitors in the same way because the United States and the states were the plaintiffs. We don't have a specific position on whether the extension to including a party in the technical committee is unreasonable, but we would only ask that the court review that determination through the reasonableness inquiry set forward in Uptronic and in other cases as to whether or not the court below abused its discretion by incorporating that element. I have two minutes left so I'll just turn to a couple of liability issues on which we have positions. So first of all, the aftermarket issue. We think that Judge Sanchez hit on just the right question. Is this a durable good? The durable good phrasing is in the aftermarket cases that are already at issue here. And here we have a very different durable good dynamic because the durable goods are manufactured by a lot of different sorts of competitors. And I think that extending it beyond that into this situation for example because the operating system is always present is something we should be really cautious about doing. As counsel for Google explained, this is an economic presumption. This is a presumption of economic effect in this aftermarket context. It replaces the normal wide-ranging anti-competitive and pro-competitive effects determination. We should be very wary of extending an economic presumption into a new economic circumstance without being really confident that it well suits that circumstance. That kind of argument of course would preclude us in a lot of these technology cases because technology changes very quickly and the technology may not be a durable good. It might not be attached to a durable good. So I'm a little surprised. You can argue that the court here did do a sufficient job but is this an extension of what the court did in any way? I don't think what the court did here is an extension. I think that what counsel for Google is asking for would extend the aftermarket line of cases beyond those that are keying off of a durable good into those where let's say it's an operating system. They would argue with you. No, we have the durable good. We've got the phones. I don't want to argue the point. I'm just saying that it's a question of terminology. Yes, Your Honor, but here the phones are manufactured by a host of different manufacturers. So this is more like VCRs were in the 80s. There's a lot of people making VCRs. Yes, there's a single standard. They're all using the same sort of video technology. But that doesn't necessarily mean that we're in an aftermarket situation. And the economics are different when you have multiple manufacturers. The degree to which upstream manufacturer investment is impacted by aftermarket behavior. It's all just different. And so there's not a lot of huge benefit to extending this economic presumption. There's also the cost. Because in these circumstances, you could get it wrong. Instead, we have the reasonableness inquiry that's already in Section 2. Here we have a jury that in fact found that there was exclusionary conduct and anti-competitive effect. That's the fulsome inquiry that the economic presumption is helping to replace. And there's not a huge benefit to going that far when you're able to do the full analysis. The last issue I'd hit briefly is just the issue preclusion issue. And the United States issue interest in particular... Counselor, I'm going to stop you unless you have questions about that topic. Okay. So if you would just wrap up. Thank you so much. We would go back to what Judge Barr said about the core issue in the antitrust laws being that each case must be taken on its own facts. And the remedies law that has developed permits district courts to craft remedies based on the specific facts and circumstances before them. We'd urge this court to preserve that capability. Thank you. All right. I think we've had a pretty full presentation today of lots of different issues. Let's put 10 minutes on the clock for rebuttal. And I would ask you to do the same as Mr. Lawrence. Let's stick with that time unless the bench takes you over. Thank you, Your Honor. I'd like to start with the jury versus bench trial issue. Judge Forrest, we agree that there is no basis in Rule 39 to force the party into a jury trial. The only case that Epic pointed you to was not only an unpublished case, the Tomlinson case, but in that case, the withdrawal came at the charge conference. So that is a very different set of circumstances than a party who makes clear it does not consent before the trial begins. In terms of prejudice, we didn't get a liability ruling consistent with Rule 52A. And if you really want to understand what that means, if you look at the Apple case, I hear Epic's counsel in the United States talking about sub-markets and overlapping markets and how that might play a role here. We have no idea what the consideration was of why this was a sub-market if it was, an overlapping market if it was, a different market. None of that is spelled out in the ruling. That is prejudice. The joint submissions that I heard Epic's counsel refer to that occurred pre-trial, pre-settlement of other people, specifically were couched in language saying, if the trial includes Epic, Match, the states, and the individuals, then we agree to a single trial. That is a very different circumstance from what happened. On preclusion, very briefly, not applying preclusion here really turns things upside down, and I want to stress why. It would mean that even though Google has more open policies than Apple, Google's policies could be deemed illegal when this court already found that Apple's policies were not. And this would saddle Google with obligations against its chief rival exactly what the Supreme Court cautioned against in Alston, injunctions that end up impairing rather than enhancing competition. On aftermarkets, the United States has made an argument for the first time today, not in their brief, about aftermarkets. But the definition of aftermarkets that this court gave in the Apple case did not limit it to a durable good in the typical concept of a durable good. It specifically found that, quote, smartphone operating systems could be a foremarket for an aftermarket that was purchases you made on a device using that smartphone. That is exactly what we have here, and the aftermarket burden should have applied to Epic in this case just like it did in the Apple case. Turning to the remedy. And I want to start by just reminding the court when we're thinking about this remedy that this is a monopoly maintenance case, not an acquisition. Epic has never said that any of the challenged conduct here is what enabled Google to acquire a monopoly. It's a maintenance case, and that's really important because, Judge Sanchez, I heard your questions trying to really get at what it is that you're trying to do with a remedy. And here's one way of thinking about it, and it's especially, I think, meaningful in a monopoly maintenance case. You're trying to draw the line, the court is trying to draw the line between what are fruits of the unlawful conduct, the violation, and what are fruits of innovation, investment, having a better product, being a first mover, because none of those things are supposed to be removed from a defendant because of an antitrust violation. And so that's like getting right exactly what the consequences of the violation are. Let me ask you then about the timing, because one of your arguments is that, I think it was before 2019, there's obviously a huge amount of innovation, acquisition of market, etc. Do you think that it was incumbent on the trial court in fashioning the remedy to, in effect, make some kind of temporal division there? And is that feasible? I think it was at least incumbent on the court to acknowledge why it found particular evidence meaningful to the consequence that it was drawing from the conduct. So, for example, Epic pointed to the contagion evidence they talked about. That contagion evidence is about a contract that began in December of 2019. So any impact that it had on anything was not the world as it existed prior to December 2019. And the court seemed to miss the importance of really honing in on the particular consequences of the particular conduct. And it did that, Your Honor, I think because it just kept waving at the jury verdict and saying, well, the jury verdict already resolved this. That is not what the court's job is in a remedies proceeding. And the Microsoft example is a really good one, because there the court spent, as I noted in my opening, 32 days trying to really get at what the consequences were. I wonder if you're proposing something that might be impossible to really parse. There are early network advantages from an early mover, and then there's evidence of anti-competitive behavior to shore that up and insulate it. Is that really the requirement that we would make of a court to somehow be able to disentangle those things? I have a hard time seeing how one could do that. Your Honor, I don't think that it requires perfection. I think reasonableness actually probably is the appropriate touchstone, but reasonableness of the inquiry that the court is tasked with doing. So I would suggest that there were at least three missing pieces to what the district court did here. The first is that there was no record-based finding as to what specific anti-competitive conduct enhanced Play's network effect and how it did so. There was simply no attempt to address that. The second is that there was no analysis of where Google's network effect stood at the start of the relevant time period in 2016 and where they finished at the time the court was looking at the injunction. This matters, because, for example, the court looked at this Amazon presentation and used that as an example. The Amazon presentation is from 2017, and at that point in time the Amazon presentation says, Google already has network effects. The other Amazon evidence in the record is that Amazon decided not to invest as a result in its app store in the same way that Google did, and the court didn't grapple with any of this because it didn't view... the notion of looking at causation. On that point, for example, are you suggesting, then, that because it's occurred before 2019 that it wouldn't have any impact in terms of the ongoing market and shouldn't be looked at? Oh, no. I think it could be looked at, but it could be looked at for what impact it had starting in 2019. I just wanted to understand, because this temporal issue I think is an important one that actually both sides have talked about. It is, and I think it gets at the third thing that I was going to suggest that the district court missed in its presentation, which is that it made no meaningful attempt to engage with why Google's early mover status, Google's extensive investment, Google's innovation, competitors' lack of investment, and Google's superior product, how all of that played a role in thinking about what the consequences are. I was really surprised to hear both EPIC and the United States talk to you about the Microsoft case today and the disclosures that were required as part of the Microsoft case, and the reason is those disclosures were agreed disclosures that were part of a consent decree. That is not remotely similar to a court-ordered injunction of a disclosure. They came up in the D.C. Circuit because Massachusetts, which had chosen not to settle, just like EPIC here, was asking for more, and the court, the D.C. Circuit said, we're not going to give Massachusetts more. The parties already agreed to these particular disclosures, and those are sufficient to remedy the harm. That underscores two things. One is that the district court here erred by ignoring, for now, over a year this state settlement, and two, that it really wasn't focused on what the impact was that it was trying to remedy. I heard the lawyer for the United States tell you that the remedy must restore competition. I want to be very clear, because Judge Donato said some of those same things. That is not right. That is the first half of the sentence I said, and if you look at page 16 of DOJ's brief, he may have just been embellishing an argument, but the remedy must undo the consequences. That's what DOJ itself says at page 16. DOJ, as I heard them today, is asking you to rewrite Optronic, to remove this causal connection language, which comes from the D.C. Circuit's Microsoft case, which comes from all the old cases all the way back to international assault, that really are focused on lifting the impact from the conduct that's been challenged and not going any more broadly to ensure that antitrust law doesn't inhibit companies like Google from continuing to invest and innovate and be early movers. All of those things are why courts proceed with caution. I think Alston put it best when it said, when it comes to remedies, caution is key. And so I would encourage the court to ensure that the first principles of antitrust law are upheld and to reverse both the liability ruling and the injunction below. Thank you, Your Honors. Thank you, Counsel. I want to take the opportunity to thank all counsel in this case. Your advocacy has been extremely high level and we really appreciate it in a case like this where we want to make sure we get it right. So the case of Epic Games v. Google is under submission for decision and the court is in recess until tomorrow morning. All rise.
judges: McKEOWN, FORREST, SANCHEZ